

**Filed**

Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## GERARD A. CRUZ,

Plaintiff/Counter-Defendant-Appellee,

**v.**

## CARMELITA C. CRUZ,

Defendant/Counterclaimant-Appellant.

Supreme Court Case No.: CVA20-001
(consolidated with CVA20-018)
Superior Court Case No.: DM0554-14

## OPINION

## Cite as: 2022 Guam 7

Appeal from the Superior Court of Guam
Argued and submitted on May 17, 2021
Via Zoom video conference

Appearing for Defendant/
Counterclaimant-Appellant:
Anita P. Arriola, *Esq.*
Joaquin C. Arriola, Jr., *Esq*.
Nicole G. Cruz, *Esq.*
Arriola Law Firm
259 Martyr St., Ste. 201
Hagåtña, GU 96910

Appearing for Plaintiff/
Counter-Defendant-Appellee:
James M. Maher, *Esq.*
Law Office of James M. Maher
238 Archbishop Flores St., Ste. 300
Hagåtña, GU 96910



**E-Received**

8/22/2022 3:41:11 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, JR., Associate Justice; JOHN A. MANGLONA, Justice *Pro Tempore*.

**CARBULLIDO, C.J.:**

[1]     This is a consolidated appeal relating to the enforcement of a Final Judgment incorporating the Stipulated Interlocutory Decree for Divorce between Gerard and Carmelita Cruz.  In Supreme Court Case No. CVA20-001, Carmelita challenges the trial court's February 2019 decision denying her motion to enforce the decree of divorce, the denial of her motion to reconsider, and a denial of attorneys' fees.  In CVA20-018, Carmelita challenges the denial of her countermotion to modify the interlocutory decree of divorce, which was submitted after the trial court's February 2019 decision, and her continued request for the award of attorneys' fees.  For the reasons below, we affirm in part and reverse in part both decisions and remand with an order to enter a money judgment for Carmelita and to partially modify the decree.

### I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     After nineteen years of marriage, Gerard filed a Complaint of Divorce alleging irreconcilable differences, and Carmelita counterclaimed for divorce alleging, *inter alia*, adultery. The parties entered into a Stipulated Interlocutory Decree for Divorce ("Stipulated Decree") and were granted a Final Decree of divorce on the ground of adultery, incorporating by reference the Stipulated Decree.

[3]     In the decree, Carmelita was awarded Lot No. 3245-NEW-REM-1-5 ("Separate Property") in Chalan Pago, which she inherited from her family, as her sole and separate property.  She was also awarded $1,000.00 per month of spousal support for at least 12 months, and Gerard committed "to provide medical insurance and dental insurance coverage through his employer for [Carmelita]

as a form of spousal support." Record on Appeal ("RA"),[1] tab 67 at 4 (Stip. Decree, Nov. 24, 2015). Gerard agreed to pay various debts acquired as community property including (1) a Personal Finance Corporation (PFC) personal loan of $1,180 per month, secured by Carmelita's Separate Property; and (2) the Community First Federal Credit Union mortgage on the marital family residence, "unless and until paid off and satisfied with the sale of the marital family residence." *Id.* at 3. The parties also agreed to "list [the marital family residence] for sale and attempt to engage a sale of that house for no less than $100,000.00 more than the balance of the current mortgages [sic] on that sale. In the event the house is sold, [Carmelita] will obtain all equity after the sale." *Id.*

[4]     The PFC loan had a 30-year amortization and five-year maturity date with a balloon payment of approximately $100,000. When the loan matured, Gerard sought an extension of the loan and applied for refinancing, offering as security his current wife's property valued at $40,000, less than half the value of the PFC loan. At the time, Gerard was receiving a gross salary of about $192,000 per year as president of Community First Federal Credit Union; he was also involved in a separate business with his current wife. When his application was denied, Gerard sought to use Carmelita's Separate Property as collateral for a new loan application, which PFC then approved under Gerard's name alone. Carmelita asserts that initially she did not want to authorize the use of the Separate Property as security for the loan "since the Stipulated Decree was clear that the PFC Loan was [Gerard's] sole and separate obligation." Appellant's Br. (CVA20-001) at 10 (June 5, 2020). *But see* Tr. at 14-15 (Mot. Hr'g, Sept. 20, 2019) (denying that she refused to use her property as collateral but noting that she was "concerned" because "if [Gerard] wanted to refinance

---

[1] All references to the Record on Appeal refer to the record for CVA20-001, unless otherwise indicated.

it with my property, and it went on default, we would be right back at square one" and she could again be in jeopardy of losing her property).

[5]     Gerard defaulted on the PFC loan, and foreclosure on the Separate Property was imminent unless the balloon payment was paid, or the loan was refinanced. Carmelita asserted that she had no notice of the default until January 2018. However, the trial court found that "PFC informed Ms. Cruz of [the fact that she needed to approve a loan revision sought by Gerard] several times from June 2017 to September 2017," but she stated that "she did not understand why she had to sign anything" and never signed the document. RA, tab 146 at 6 (Dec. & Order, Feb. 11, 2019). During this time, the parties were also in dispute over Gerard's failure to pay various other debts he had agreed to assume under the Stipulated Decree, for which a money judgment was later issued against him for $19,826.75.

[6]     The court below found that Gerard sought to refinance the PFC loan, but that the new loan would need to be secured by Carmelita's Separate Property. The court also found that Carmelita was informed of the new loan and "that she would be required to execute a mortgage securing her property to the new loan," but Carmelita would not sign off. *Id.* at 7.

[7]     The timeline is unclear, but Carmelita alleges that she eventually agreed to using her Separate Property as collateral for the new refinancing loan, despite her objections, to safeguard her inheritance. Appellant's Br. (CVA20-001) at 10-11 (citing Tr. at 10-11 (Bench Trial, Mar. 30, 2018)). Gerard testified that he was approved for a new loan using Carmelita's Separate Property as collateral in January 2018. He also testified that although he was receiving "mixed messages from different sources," he heard from PFC that Carmelita would sign the refinancing documents. Tr. at 29 (Bench Trial, Nov. 13, 2018). But after her acquiescence, Carmelita alleges that Gerard refused to sign the required refinancing documents before foreclosure occurred because he wanted

Carmelita to pay the approximately $5,000 in attorneys' fees associated with the refinancing.[2] Appellant's Br. (CVA20-001) at 11. In testimony, Gerard agreed that "[t]he holdup was the $2,700 in fees, the reason for it was . . . because it was not just that I believe she had to pay for it, even though my emails state that. I wasn't going to disclose to Nathan Oledan that I didn't have $2,700 in email. It's embarrassing . . . ." Tr. at 30-31 (Bench Trial, Nov. 13, 2018). Gerard never signed the refinancing documents.

[8]      In January 2018, Carmelita filed her Motion for Order to Show Cause and Contempt; Motion to Enforce Decrees; and Motion for Writ of Execution and Judgment Debtor Examination, requesting, among other things, that the court issue an Order to Show Cause; compel Gerard to pay attorneys' fees, the PFC loan, and "all fees and costs of preventing foreclosure and default of the loan"; hold him in contempt for failing to satisfy the debts; and issue the Writ of Execution Carmelita had lodged with the court to compel Gerard to pay the August 2017 Money Judgment. While the motions were still pending, PFC foreclosed on the Separate Property, and it was sold. However, Carmelita had a right to redeem the property, by paying the value of the land, $88,500, plus the deficiency balance of $19,591, for a total of $108,091 plus other closing costs and attorneys' fees. That right to redeem expired. After PFC foreclosed on the Separate Property, Carmelita replied to Gerard's opposition to the motions and requested, among other things, another money judgment in the amount of the total foreclosure sale with any deficiencies, or the appraised value of the property, whichever is higher, and "attorney's fees for enforcing and collecting on the debts Gerard was required to pay." RA, tab 127 at 3-4 (Def's Reply Mem., Mar. 12, 2018).

---

[2] As a point of clarification, the testimony suggests that the disputed fees related to attorney costs for the foreclosure, not closing costs or refinancing generally. These attorneys' fees were only a subset (approximately $2,700) of the total closing costs, which were approximately $5,000-6,000. Gerard had agreed to pay the remainder of the closing costs. *See* Tr. at 51-53, 72, 75-76 (Bench Trial, Mar. 30, 2018).

Around April 2018, Gerard paid the approximately $20,000 deficiency after foreclosure on the PFC loan.

[9]     Meanwhile, Gerard and Carmelita were in an ongoing dispute over the list price for their marital home, which they had undertaken to sell. In a March 15, 2017 Decision and Order, the court ordered the parties to "list the marital home for sale at $574,000.00, or at any other higher price mutually agreed to by the parties." RA, tab 83 at 7 (Dec & Order, Mar. 15, 2017). The parties had also been in dispute over Gerard's failure to pay various other debts he had agreed to assume under the Stipulated Decree, for which a money judgment was issued against him for $19,826.75. Gerard contends that his inability to pay his other obligations under the agreement resulted from Carmelita's non-cooperation with listing the marital home, which caused him to prioritize payment of the mortgage on the marital home over his other obligations. While Carmelita's contempt motion in relation to the PFC loan was pending, Gerard filed his Second Motion for Order to Show Cause and Contempt requesting that the court hold Carmelita in contempt for failure to sign a listing agreement to sell the marital residence. But by the time the court issued its February 2019 Decision and Order, Carmelita had signed the listing agreement, and the court found Gerard's motion moot.

[10]     The trial court issued a Decision and Order dismissing Carmelita's motion for writ of execution and judgment debtor examination and Gerard's contempt motion as moot; the court also denied Carmelita's contempt motion and motion to enforce decree. Carmelita moved to reconsider because new material facts had emerged and the court's decision manifested a failure to consider material facts presented to the court before its decision. She noted that the court had not ruled on her request for a second money judgment to reimburse her for the Separate Property or her attorneys' fees and that Carmelita's right to redeem had expired with the property permanently

lost. She specifically asked the court reconsider its holding that subsection II(A)(2) of the Stipulated Decree only required Mr. Cruz to make minimum monthly payments on the PFC loan and "[i]nstead, hold that the parties agreed for [Gerard] to be solely liable for the 2012 PFC Loan, whether it was to pay off the balloon payment at the time of maturity, or refinance without requiring [Carmelita's] separate property." RA, tab 150 at 4 (Def.'s Mot. Recons., Feb. 21, 2019). After additional motions, hearings, and supplemental briefing, the court issued a decision denying Carmelita's Motion for Reconsideration in its entirety. Carmelita timely appealed.

[11]     In March 2019, Gerard filed a Motion to Sell Marital Residence, requesting that the court order the property sold to the highest written offer received in 120 days. Carmelita filed her opposition to that motion, arguing that the marital residence should continue to be listed for $574,000.00, as well as a Counter-Motion to Modify the Stipulated Interlocutory Decree of Divorce, seeking attorneys' fees, a money judgment for the value of her Separate Property lost in foreclosure, and spousal support to include both $3,000 monthly and the marital residence. During the litigation, Carmelita's diagnosis of Non-Hodgkin's Lymphoma progressed to Stage 3, and she started chemotherapy in July 2019. Because of her deteriorating health, Carmelita moved to working part-time but benefitted from her employer's "donated leave" program which allowed her coworkers to donate their accrued medical leave for her use. The trial court denied Gerard's Motion to Sell and later denied Carmelita's countermotion. Carmelita timely appealed, and the two appeals were consolidated.

## II. JURISDICTION

[12]     This court has jurisdiction over an appeal from a final judgment of the Superior Court of Guam under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-166 (2022)), and 7 GCA §§ 3107 and 3108(a) (2005). Title 7 GCA § 25102(b) (2005) provides that "[a]n appeal in a civil

action or proceeding may be taken . . . (b) [f]rom an order made after a judgment made appealable by subdivision (a)."[3] In *Zurich Insurance (Guam), Inc. v. Santos*, 2007 Guam 23 ¶¶ 6-10, we adopted two requirements for a post-judgment order to be appealable as established in California by *Lakin v. Watkins Associated Industries*, 863 P.2d 179 (Cal. 1993). First, "the issue raised by the appeal from the order must be different from those arising from an appeal from the judgment." *Zurich*, 2007 Guam 23 ¶ 8 (quoting *Lakin*, 863 P.2d at 183). Otherwise, two appeals could effectively be allowed from the same ruling and might allow the circumvention of time limitations for appealing the original judgment. *Id.* (quoting *P R Burke Corp. v. Victor Valley Wastewater Reclamation Auth.*, 120 Cal. Rptr. 2d 98, 102 (Ct. App. 2002)). Second, "the order must either affect the judgment or relate to it by enforcing it or staying its execution." *Id.* ¶ 9. Thus, post-judgment orders are generally not appealable if they are "'more accurately understood as being preliminary to a later judgment, at which time they will become ripe for appeal'" or "'pertain[] to the preparation of a record for use in a future appeal.'" *Id.* ¶ 10 (alteration in original) (quoting *Roden v. AmerisourceBergen Corp.*, 29 Cal. Rptr. 3d 810, 814 (Ct. App. 2005)).

[13] In *Zurich*, the first element was satisfied because the original judgment related to Santos's liability to Zurich, while the post-judgment appeal concerned whether the court could order Santos to search for a job so she could satisfy that liability. *Id.* ¶ 11. The issue related to the enforcement of the final judgment, thereby satisfying the second element, because it was "by its terms an order to create assets to pay the final judgment." *Id.* ¶ 12. It was not preliminary to later proceedings because the defendant's liability had been established and was not subject to any review in the appeal, nor did it relate to preparing a record for a later appeal. *Id.*

---

[3] Title 7 GCA § 25102(a) provides that an appeal may be taken "[f]rom a judgment, except (1) an interlocutory judgment other than as provided in subdivisions (h), (i) and (j); [and] (2) a judgment of contempt which is made final and conclusive by § 34106 of this Title (Contempts)." 7 GCA § 25102(a) (2005) (second alteration in original).

**A. February 11, 2019 Decision and Order**

**[14]**    The February 11, 2019 Decision and Order disposed of Carmelita's January motions, including her (1) Motion for Order to Show Cause and Contempt; (2) Motion to Enforce Decrees; and (3) Motion for Writ of Execution and Judgment Debtor Examination, and Gerard's Second Motion for Order to Show Cause and Contempt.  Carmelita clarified in her Reply Brief and in oral arguments that she appeals only the denial of the motion to enforce the Stipulated Decree. Appellant's Reply Br. (CVA20-001) at 2 (July 30, 2020).

**[15]**    The decision to deny the motion to enforce the decrees is reviewable here because the motion does not seek to alter or challenge the judgment itself but relates to its enforcement, satisfying both parts of the *Zurich* test.  In *Sharrock v. McCoy*, 2016 Guam 7 ¶ 40, this court confirmed that an order granting a motion to enforce a settlement is a final, appealable order if it resolves all matters between the parties.  Denial of such a motion would equally be appealable.

**B. April 2019 Countermotion to Modify the Stipulated Decree**

**[16]**    This court has jurisdiction to review the countermotion to modify the stipulated decree because the motion does not challenge the decree as originally adopted but moves for modification based on new circumstances arising since the judgment.  The issues differ from those arising from an appeal from the judgment, and a grant of the motion would affect the judgment, in satisfaction of both *Zurich* requirements.

## III.  STANDARD OF REVIEW

**[17]**    Decisions interpreting a consent decree and its underlying agreement, including divorce decrees incorporating settlement agreements, are reviewed *de novo*.  *Leon Guerrero v. Leon Guerrero*, 2014 Guam 6 ¶ 14 (citing *Leon Guerrero v. Moylan*, 2000 Guam 28 ¶ 8).  "Interpretation of a settlement agreement is a question of law subject to de novo review, but we defer to any

factual findings made by the [trial] court in interpreting the settlement agreement unless they are clearly erroneous." *Sharrock*, 2016 Guam 7 ¶ 51 (quoting *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010)). The trial court's characterization of property in a marital dissolution as community or separate property is reviewed *de novo*. *Hart v. Hart*, 2008 Guam 11 ¶ 24.

[18]     We review the denial of a motion for reconsideration for an abuse of discretion. *Richardson v. Richardson*, 2010 Guam 14 ¶ 10 (citing *Quitugua v. Flores*, 2004 Guam 19 ¶ 12 (per curiam)). "A trial court abuses its discretion when its decision is based on an erroneous conclusion of law or where the record contains no evidence on which the judge could have rationally based the decision." *Town House Dep't Stores, Inc. v. Ahn*, 2003 Guam 6 ¶ 27 (quoting *Brown v. Eastman Kodak Co.*, 2000 Guam 30 ¶ 11).

[19]     Attorney fee awards are reviewed for an abuse of discretion. *See Cruz v. Cruz*, 2005 Guam 3 ¶ 8. Issues of statutory interpretation are reviewed *de novo*. *Leon Guerrero*, 2014 Guam 6 ¶ 14.

## IV.  ANALYSIS

### A.  The Trial Court Erred in Denying Carmelita's Motion to Enforce Decrees Based on an Erroneous Finding That Gerard Had a Right to Secure a New Loan with Her Separate Property

[20]     As part of her January 29, 2018 filing, Carmelita moved the court "to enforce the 'Stipulated Interlocutory Decree.'" RA, tab 117 at 1 (Def.'s Mot., Jan. 29, 2018). Although the motion is styled as a "Motion for Order to Show Cause & Contempt; Motion to Enforce Decrees; Motion for Writ of Execution and Judgment Debtor Examination," only the first and third motions are given their own discussion sections in the Memorandum of Points and Authorities. *See id.* In the section of her Memorandum devoted to the Motion for Order to Show Cause and Contempt, Carmelita argues that "[Gerard] should be ordered to pay the PFC loan, prevent any foreclosure

proceedings, and indemnify and hold [Carmelita] harmless on the loan. He should further be ordered to pay all fees and costs of preventing foreclosure and default of the loan." *Id.* at 6.

[21]     Carmelita contends that the foreclosure resulted from Gerard's refusal to sign the refinancing documents unless Carmelita paid the attorneys' fees associated with the refinancing. *See* Appellant's Br. (CVA20-001) at 11. Gerard contends, and the trial court held, that the default and foreclosure resulted from Carmelita's refusal to sign off on the refinancing and general inaction. *See* Appellee's Br. (CVA20-001) at 9-10 (July 17, 2020); RA, tab 146 at 7-9 (Dec. & Order, Feb. 11, 2019). Gerard contends that under the promissory note, he had a right to refinance the loan and that in "reaffirm[ing] the mortgage and promissory note in the [Settlement] [A]greement," Carmelita affirmed both the use of her property to secure the note and Gerard's right to refinance the balloon payment by pledging Carmelita's separate property. *See* Appellee's Br. (CVA20-001) at 8-9, 17-18. All this, despite the couple having been divorced for at least two years when the loan matured.

> **1. The plain meaning of the Decree confirms that the parties intended Carmelita's Chalan Pago property to be her sole and separate property and that payment of the PFC loan would be the sole and separate obligation of Gerard**

[22]     Title 19 GCA § 6102(a)(3) defines separate debt to include "a debt designated as a separate debt of a spouse by a judgment or decree of any court having jurisdiction." 19 GCA § 6102(a)(3) (2005). Title 19 GCA § 6101(a)(5) similarly defines separate property to include "property designated as separate property by a judgment or decree of any court having jurisdiction," and section 6101(a)(7) includes in that definition "property designated as separate property by a written agreement between the spouses."

[23]     In his opposition brief, Gerard repeatedly calls the PFC loan a "community debt" when arguing that the Stipulated Decree gave Gerard "a contractual right . . . to pledge Appellant's

property pursuant to the parties' agreement." *See, e.g.*, Appellee's Br. (CVA20-001) at 16-17, 19. However, the agreement identifies the PFC loan not as a community debt but as a "sole and separate obligation[ ]" of Gerard. RA, tab 67 at 3 (Stip. Decree, Nov. 24, 2015). Whether or not the debt was acquired as a community debt during the marriage, the Stipulated Decree unambiguously stated "[t]hat the community debts and obligations shall be awarded to the Parties as follows: A. To [Gerard], as his sole and separate obligation[]. . . 2. Personal Finance Corporation (PFC) Personal Loan secured by Lot No. 3245-NEW-REM-1-5, Municipality of Chalan Pago, Guam in the amount of $1,180.00 per month." *Id.* The Stipulated Decree also unambiguously designated Lot No. 3245-NEW-REM-1-5 as Carmelita's "sole and separate property" with no qualification. *Id.* at 2. The trial court itself explicitly found that "[Gerard] agreed to assume certain debts and obligations, including a 'Personal Finance Corporation (PFC) personal loan.'" RA, tab 146 at 2 (Dec. & Order, Feb. 11, 2019).

[24]    Decisions interpreting a consent decree and its underlying agreement, including divorce decrees incorporating a settlement agreement, are reviewed *de novo*, *Leon Guerrero*, 2014 Guam 6 ¶ 14 (citing *Moylan*, 2000 Guam 28 ¶ 8), using the principles of contract interpretation, *Moylan*, 2000 Guam 28 ¶ 8. We interpret contracts to give effect to the parties' intentions at the time of contracting, taking the entire contract together as a whole. 18 GCA §§ 87102, 87107 (2005); *see also Moylan*, 2000 Guam 28 ¶ 8.

[25]    The court interpreted the provision of subsection II(A)(2) as only requiring Gerard to "make minimum monthly payments [of at least $1,180] on the 2012 PFC Loan and assume other associated costs, such as refinancing fees, and that Ms. Cruz agreed to permit her property to serve as collateral on that loan so that Mr. Cruz could continue making reasonable monthly payments on the balance." RA, tab 146 at 7-8 (Dec. & Order, Feb. 11, 2019). But taking the agreement as a

whole, the ultimate responsibility for the balance of the PFC loan is not assigned elsewhere, and many provisions, such as subsections II(A)(3), (5), and (6) relating to debts include an estimated monthly payment. *See* RA, tab 67 at 3 (Stip. Decree, Nov. 24, 2015). It would be illogical for each provision to assign responsibility only for the monthly payments, and not ultimate responsibility for the entire debt. To interpret them otherwise would mean a complete division of all the couple's assets and obligations had not been achieved, as ultimate responsibility for the entire balance of multiple loans was not distributed. We reverse the narrow interpretation of the trial court and find that the parties intended to assign complete responsibility for payment of the PFC loan to Gerard in the Stipulated Decree.

### 2. The court erred in finding that Carmelita had to allow use of her Separate Property as collateral for a new loan in Gerard's name

[26]     The refinancing for which Gerard sought use of Carmelita's Separate Property was not a modification or extension of the existing personal loan but a new loan. The trial court found that "Mr. Cruz was approved for a new loan to pay off the 2012 PFC Loan for approximately $103,000.00; however, PFC required that the new loan be secured by the same property that secured the 2012 loan—Ms. Cruz's property." RA, tab 146 at 7 (Dec. & Order, Feb. 11, 2019). Thus, the trial court itself found that the refinancing in question was a separate loan and acknowledged that the property PFC and Gerard sought to use as collateral belonged to Carmelita. But the court did not explain how one spouse could be forced well after a finalized divorce to use her separate property as security for a new loan in her ex-spouse's name, even if that new loan was used to satisfy a sole and separate obligation of the ex-spouse secured by the separate property. The Stipulated Decree unambiguously designated the PFC loan as a separate debt of Gerard and the Separate Property as the sole and separate property of Carmelita so that it met the definition of separate property in 19 GCA § 6101(a)(5). Furthermore, 19 GCA § 6101(h) states: "Neither

husband nor wife has any interest in the separate property of the other, except as provided in § 6105 . . . ." Yet the court's decision effectively found that Gerard retained an interest in Carmelita's Separate Property to use as collateral for a subsequent loan.

[27] The trial court claimed that both parties knew of the impending balloon payment at the time of the Stipulated Decree and could have contracted not to have Carmelita's Separate Property used to secure any refinancing. *See* RA, tab 146 at 8 (Dec. & Order, Feb. 11, 2019). But the court should not have read silence on the issue as an agreement that the Separate Property could be used as collateral for future refinancing. The plain meaning of the provision was that the Separate Property would stand as security only for the 2012 PFC loan. *See* RA, tab 67 at 3 (Stip. Decree, Nov. 24, 2015) ("Personal Finance Corporation (PFC) Personal Loan secured by Lot No. 3245-NEW-REM-1-5"). Without an express agreement of the parties to the contrary, the statutory rule of 19 GCA § 6101(h) that spouses have no interest in the separate property of the other governs.

[28] The trial court also said that "Ms. Cruz's assumption that Mr. Cruz would simply pay the entirety of the loan off at once was unreasonable . . . ." RA, tab 146 at 9 (Dec. & Order, Feb. 11, 2019). This was not an "assumption" by Carmelita but the terms of the promissory note. *Id.* at 6. If the court found that Gerard knew the balloon payment would become due in 2017 and that he entered into the Stipulated Decree voluntarily, it is not for the court to usurp the parties' intent by finding a right of Gerard to retain an interest in Carmelita's separate property—the right to use her property as collateral for a new loan—that is not reflected in the plain meaning of the agreement, simply because Gerard claimed he could not meet his assumed obligation otherwise.

[29] The trial court also found that "[b]oth parties were required to execute the revision and refinancing agreements, and Mr. Cruz had already done his part." RA, tab 146 at 8 (Dec. & Order, Feb. 11, 2019). But this finding of fact was clearly erroneous because Gerard did not sign the re-

financing documents because he refused to pay attorneys' fees associated with the foreclosure. RA, tab 150 at 2-3 (Def.'s Mot. Recons., Feb. 21, 2019); *see also* Tr. at 5-7, 30-31 (Bench Trial, Nov. 13, 2018); Tr. at 76-77 (Bench Trial, Mar. 30, 2018). In testimony, Gerard agreed that "[t]he holdup was the $2,700 in fees, the reason for it was . . . not just that I believe she had to pay for it, even though my emails state that. I wasn't going to disclose to Nathan Oledan that I didn't have $2,700 in email. It's embarrassing . . . ." Tr. at 30-31 (Bench Trial, Nov. 13, 2018). Contrary to the court's holding, Gerard did not do everything in his power to prevent the foreclosure on the property because he did not sign the refinancing documents in time to avoid foreclosure. *See* Tr. at 77 (Bench Trial, Mar. 30, 2018).

[30]    Because of Gerard's failure to pay the balloon payment and PFC's foreclosure, Gerard's separate obligation of approximately $100,000 was wiped out with the loss of Carmelita's Separate Property appraised at $88,500, in clear contravention of the intent of the parties in the Stipulated Decree to benefit Carmelita with the retention of her Separate Property while encumbering Gerard with the PFC obligation. *See* Tr. at 10-12, 81 (Bench Trial, Mar. 30, 2018); RA, tab 146 at 2 (Dec. & Order, Feb. 11, 2019).

### 3. Carmelita should be reimbursed for her sole and separate property used to satisfy the sole and separate obligation of Gerard

[31]    In *Babauta v. Babauta*, 2011 Guam 15, we held that "a spouse who, after separation of the parties, uses his or her separate funds to pay preexisting community obligations is entitled to reimbursement upon divorce." *Id.* ¶ 45. Here, beyond using separate funds to pay a *community* obligation during the process of separation, the foreclosure resulted in the use of Carmelita's sole and separate property to satisfy Gerard's sole and separate obligation well after the divorce and in contravention of the Stipulated Decree. Thus, she is entitled to reimbursement from the party whose obligation was paid.

[32]    We reverse the finding of the trial court holding that Carmelita had to allow her Separate Property to be used as security to refinance the PFC loan and holding Carmelita at fault for the foreclosure. The Decree can no longer be enforced by ordering Gerard to pay the debt because the debt was extinguished by the foreclosure and his payment of the deficiency. Any right of redemption has also expired. But to give effect to the intent of the Decree, we remand with instructions to issue a money judgment against Gerard for the value of Carmelita's Separate Property lost in the foreclosure.

## B. Carmelita's Motion to Reconsider

[33]    Whether the trial court abused its discretion in denying Carmelita's motion to reconsider is rendered moot by our reversal of the decision on the motion to enforce the decree and Carmelita's concession as to the other motions disposed of in the February 11, 2019 Decision and Order.

## C. Countermotion to Modify the Decree

[34]    Carmelita's countermotion (integrated into her opposition to Gerard's motion to sell marital residence) contained multiple requests: (1) that the court grant her $3,000.00 per month in spousal support; (2) that the marital residence be awarded to her as a form of spousal support; (3) that she be awarded a money judgment of $88,500.00; and (4) that Gerard be ordered to pay her attorneys' fees. *See* RA, tab 165 at 2 (Def.'s Opp'n Mot., Apr. 23, 2019). The court declined to address the requested money judgment, finding it was the same relief that formed the subject of the February 2019 and December 2019 Decisions and Orders already on appeal. RA, tab 203 at 3 (Dec. & Order, Sept. 8, 2020). We have already awarded Carmelita the value of her Chalan Pago property lost to foreclosure as reimbursement to enforce the decree. This leaves the request for monthly spousal support, the marital residence, and attorneys' fees.

### 1. Spousal support

**[35]** Unlike a settlement agreement dividing property, spousal support and maintenance is subject to modification by the court. *Scroggs v. Scroggs*, 2014 Guam 2 ¶ 18. Title 19 GCA § 8405 provides:

> When a dissolution of marriage is granted, the tribunal shall . . . make such suitable allowance to the other spouse for that person's support . . . as the Court may deem just, having regard to the circumstances of the parties respectively; and the Court may, from time to time, modify its order in these respects.

19 GCA § 8405 (2005).

**[36]** We previously held that the availability of modification depends on the nature of the support agreement. *See Lujan v. Lujan*, 2012 Guam 7 ¶ 39. In *Scroggs*, we outlined three types of post-separation support agreements:

> First, an agreement may relate to alimony, and provide for lump sum or periodic payments which are separate from the division of property. Second, support provisions may not be in the nature of alimony, but rather part of a division of property, in which payments are given in lieu of community property. Third, a spouse may waive all maintenance and support, or waive it as provided in an agreement, in exchange for a more favorable settlement of the community property.

2014 Guam 2 ¶ 20 (citations omitted). The first category may be modified under the court's general power over alimony. *Lam v. Lam*, 2015 Guam 6 ¶ 20. The second category is treated like other division of property agreements which are not modifiable without consent of the parties except in cases of fraud or violation of the parties' confidential relationship, and the third may or may not be modifiable depending on the integration of the agreement. *See id.* ¶¶ 21-22.

**[37]** After our decisions in *Scroggs* and *Lam*, the legislature amended 19 GCA § 6111(b) and added subsection (d) such that now, an agreement by the parties for spousal support is, in general, subject to subsequent modification or termination by court order unless the parties specifically agree to the contrary. *See* 19 GCA § 6111(b), (d) (as amended by Guam Pub. L. 33-026:2-3 (May 7, 2015)). Subsection (b) provides that provisions for support in a divorce settlement agreement

are "separate and severable" from provisions relating to property and are "made under the power of the court to order spousal support."  19 GCA § 6111(b).  Subsection (d) provides that support provisions "are subject to subsequent modification or termination by court order" except as to amounts accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate or when a written agreement or oral agreement entered into in open court "specifically provides that the spousal support is *not* subject to modification or termination."  19 GCA § 6111(d)(1)-(3).  The amendments eliminated the need for the trial courts to examine each agreement to determine if it is integrated.

[38]    The trial court found that the support provisions of the Stipulated Decree were modifiable because they fell under the first type of post-separation support agreements outlined in *Scroggs*. RA, tab 203 at 4 (Dec. & Order, Sept. 8, 2020).  The court did not consider the amendments to 19 GCA § 6111.  The support order was on its own in section III, and section III does not specifically foreclose modification of the support provision.  Therefore, under 19 GCA § 6111(d), the support provision is subject to modification or termination.

[39]    Despite finding that the provision of section III relating to support was modifiable, the court found that Carmelita had not established a change in circumstances sufficient to warrant modification.  *Id.* at 5-8.  To modify an award of spousal support, the court "must determine whether there is a material change in circumstances warranting modification, and the moving party must prove that there exists a nexus between the change of circumstances and the change in need." *Kang v. Kang*, 2014 Guam 25 ¶ 18 (quoting *Malabanan v. Malabanan*, 2013 Guam ¶ 30); *see also Rodriguez v. Rodriguez*, 2003 Guam 8 ¶ 7, *overruled on other grounds by Paguio v. Paguio*, 2014 Guam 36.  In deciding issues of spousal support, a court must consider the economic circumstances of the parties, including their assets, incomes, earning capacities, needs, and abilities to pay.  *Cf.*

*Cruz*, 2005 Guam 3 ¶¶ 9-10 (addressing provision under 19 GCA § 8402 allowing alimony to prosecute or defend divorce action); *Sweeley v. Sweeley*, 170 P.2d 469, 470 (Cal. 1946) (in bank) (addressing spousal support during pendency of divorce action). Thus, the court must balance not only the needs of the requesting party but also the financial situation and ability to pay of the requested party. The court below considered, *inter alia*, Carmelita's arguments that the disparity in income between the two parties, an increase in her expenses because of her medical diagnosis, and the expense of enforcing the judgments amounted to changed circumstances but found it did not amount to sufficient evidence warranting modification, especially given Gerard's own demonstrated financial difficulties. *See* RA, tab 203 at 6-8 (Dec. & Order, Sept. 8, 2020). The court correctly noted that the disparity in income between the two parties existed at the time of the Stipulated Decree and should not be considered a changed circumstance and cited *Malabanan v. Malabanan*, 2013 Guam 30 ¶ 30, for the proposition that "[m]aintaining a litany of expenses is not sufficient to justify an increase of spousal support." RA, tab 203 at 6-7 (Dec. & Order, Sept. 8, 2020) (alteration in original) (quoting *Malabanan*, 2013 Guam 30 ¶ 30).

[40]    Carmelita does not identify evidence not considered by the court or otherwise establish how the court abused its discretion. She points out that Gerard failed to produce a detailed list of all his debt obligations for the present motion and challenges the court's reliance instead on his 2016 declaration of his debts. *See* Appellant's Br. (CVA20-018) at 37 (Jan. 20, 2021). However, as the moving party seeking to modify the decree, it was her burden to show that Gerard could pay, rather than Gerard's burden to show his inability to pay. *See Rodriguez*, 2003 Guam 8 ¶ 7. Because the court's decision was rational, given the evidence before it, and because Carmelita fails to identify "clear error of judgment in the conclusion [the court] reached upon weighing of the relevant factors," *Stahl v. Stahl*, 2013 Guam 26 ¶ 8 (quoting *People v. Singeo*, 2012 Guam 27 ¶ 8),

the trial court did not abuse its discretion in denying the $3,000 requested by Carmelita in monthly support based on a disparity in income, Carmelita's increased expenses, or the use of Gerard's 2016 debt declaration. However, a material change has been shown in Carmelita's medical expenses because of her progressing cancer and chemotherapy costs. *See* Tr. at 11–20 (Bench Trial, July 6, 2020). During the litigation, Carmelita's diagnosis of Non-Hodgkin's Lymphoma progressed to Stage 3, and she started chemotherapy in July 2019. Tr. at 4, 7-8 (Bench Trial, Oct. 14, 2019); Tr. at 12 (Bench Trial, July 6, 2020). Because of her deteriorating health, Carmelita moved to working part-time and relies on her employer's "donated leave" program which allows her coworkers to donate their accrued medical leave for her use. *See* Tr. at 15-17 (Bench Trial, Oct. 14, 2019). A material change has also occurred in Gerard's ability to pay due to the trial court's prior decision not to require Gerard to pay Carmelita's health insurance once his employer discontinued coverage for former spouses. *See* RA, tab 102 at 4-5 (Dec. & Order, Aug. 14, 2017). There is a nexus between the change in circumstances and Carmelita's change in need, as required in *Kang*; therefore, we remand with an order to modify the decree to require Gerard to pay for Carmelita's health insurance premiums.

### 2. Property division of the marital residence

[41] Although Carmelita in her countermotion to modify the decree and in the present appeal argues that retention of the marital residence would be a form of spousal support, *see* RA, tab 165 at 2, 5 (Def.'s Opp'n Mot., Apr. 23, 2019); Appellant's Br. (CVA20-018) at 28-32, the trial court found that the distribution of the marital residence in section I entitled "Community Property" was a division of property and not a form of support, *see* RA, tab 203 at 4-5 (Dec. & Order, Sept. 8, 2020). A division of property agreement forming part of a divorce decree is not modifiable except in cases of fraud or gross inequity. *Scroggs*, 2014 Guam 2 ¶ 18.

**[42]**    We affirm the finding that the marital residence division was a property division and not a form of spousal support.  Carmelita provides no legal support for her assertion that it should be treated as alimony.  She points, among other things, to the absence of language requiring an even split of the residence, that the parties never agreed to sell but only to try to sell the residence, and that the divorce was granted on grounds of adultery, without explanation as to why these facts warrant finding that the provision was spousal support rather than a division of property.  *See* Appellant's Br. (CVA20-018) at 29-32.  The plain meaning of including the disposition of the marital residence within the section entitled "Community Property" is that it amounted to a division of property and not a form of alimony.

**[43]**    We also affirm the court's finding that modification under the division of property standard was not warranted because "Carmelita has not presented any evidence of fraud nor advanced any arguments that the Interlocutory Decree is grossly inequitable."  RA, tab 203 at 5 (Dec. & Order, Sept. 8, 2020).  Carmelita points to the prior failure of Gerard to pay the debts assigned to him that led to a money judgment which was eventually paid in full in November 2018.  *See* Appellant's Br. (CVA20-018) at 32-33; RA, tab 146 at 4 (Dec. & Order, Feb. 11, 2019).  She also points to the failure of the court to hold Gerard in contempt, Gerard's failure to continue providing health insurance, and the foreclosure on her Separate Property as evidence of gross inequity.  Appellant's Br. (CVA20-018) at 32-34.  But she fails to provide legal support for why these bare assertions of fact alone meet the high hurdle of proving that the disposition of the marital residence was grossly inequitable when the agreement was made.  While the court's denial of her motion to enforce the decree may have caused an inequity, this is already addressed by the money judgment to reimburse her for the lost Separate Property so that an award of the marital residence in addition is not warranted.

### E. Attorneys' Fees

[44]     Guam follows the "American Rule," which requires that each party to a suit pay for its own attorneys' fees unless an award of such fees is authorized by statute, contract, or the interests of judicial equity. *Fleming v. Quigley*, 2003 Guam 4 ¶¶ 7, 13. In the briefs below and on this appeal, Carmelita relies only on 19 GCA § 8402 to support her request for fees. *E.g.*, Appellant's Br. (CVA20-018) at 38. She does not allege, and the Stipulated Decree does not contain, any contractual agreement between the parties on the issue of attorneys' fees.

[45]     Under 19 GCA § 8402, a court may in its discretion award to one spouse in a divorce action "'any money *necessary* to enable the wife, or husband to . . . prosecute or defend the action.'" *Cruz*, 2005 Guam 3 ¶ 9 (quoting 19 GCA § 8402 (2005)). Necessity depends on the financial circumstances of the parties and their needs, and to decide, a judge "'must be informed in detail not only as to [the movant's] needs, but also her resources.'" *Id.* ¶ 10 (quoting *Loke v. Loke*, 217 P.2d 477, 478 (Cal. Dist. Ct. App. 1950)). Attorneys' fees may be awarded under section 8402 "[w]hen an action for dissolution of marriage is pending." 19 GCA § 8402. In *Stahl v. Stahl*, 2013 Guam 26 ¶ 42, we agreed with California courts interpreting a similar statute that the existence of a marriage is necessary for the court to award money. Thus, the ability to recoup fees under section 8402 terminates when the marriage is dissolved. *See id.* ¶ 44. We have previously held that according to 7 GCA § 26707, the time a divorce action is "pending" includes the time on appeal for the original divorce action. *See id.*; *Cruz*, 2005 Guam 3 ¶¶ 17-20. Title 7 GCA § 26707 states that "[a]n action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed." But this does not extend to post-judgment enforcement, especially when the marriage has been dissolved for several years, as is the case here.

**[46]**    Because Carmelita is not entitled to attorneys' fees under 19 GCA § 8402 and does not identify any alternative basis for such an award, we affirm the trial court's denial of her request and decline to award any fees for this appeal.

### V.  CONCLUSION

**[47]**    We **REVERSE IN PART** the February 11, 2019 Decision and Order insofar as it held that the Stipulated Decree required Carmelita to allow her Separate Property to be used to secure a new loan to refinance a separate obligation of Gerard and that she had caused the loss of her Separate Property through inaction.  We **REMAND** to the trial court with an order to enter a money judgment for Carmelita in the amount of the value of the foreclosed Separate Property.  We **AFFIRM IN PART** and **REVERSE IN PART** the denial of the motion to modify the decree and **REMAND** with an order to modify the decree to require Gerard to pay Carmelita's health insurance premiums.  Finally, we **AFFIRM** the denial of Carmelita's request for attorneys' fees before the trial court and **DECLINE** to award any attorneys' fees associated with this appeal.

/s/
ROBERT J. TORRES
Associate Justice

/s/
JOHN A. MANGLONA
Justice *Pro Tempore*

/s/
F. PHILIP CARBULLIDO
Chief Justice